# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWN L. MCCLURE and<br>GREGORY A. MCCLURE | : CIVIL ACTION<br>:<br>: |
| v. | :<br>: |
| ERIC L. PARVIS, M.D., THE CHESTER<br>COUNTY HOSPITAL, d/b/a Chester<br>County Hospital, THE CHESTER<br>COUNTY HOSPITAL AND HEALTH<br>SYSTEM, d/b/a Penn Medicine and/or<br>Penn Medicine Chester County Hospital<br>and/or d/b/a Chester County Hospital<br>and/or d/b/a Penn Family Medicine<br>Unionville, PENN VALLEY MEDICINE<br>UNIONVILLE | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: NO. 17-3049 |

## MEMORANDUM OPINION

**Savage, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　February 6, 2018

　　In this medical malpractice action, plaintiff Dawn McClure[1] alleges that she suffered permanent brain injury as a result of the defendants' failure to timely screen and treat her. She names as defendants Penn Valley Medicine Unionville (Unionville), her primary physician's office, which refused to see her when she presented; Chester County Hospital (CCH), where she was later taken by ambulance; Dr. Eric Parvis, the emergency room physician; and the Trustees of the University of Pennsylvania (Trustees), who own Unionville and CCH.

　　CCH moves to dismiss the claim under the Emergency Medical Treatment and Labor Act (EMTALA) for failure to screen an emergency medical condition, contending

---

[1] Gregory McClure brings a consortium claim only. Throughout this memorandum opinion, we refer to Dawn McClure as McClure.

that it performed a timely initial screening.  CCH also argues that McClure fails to allege any facts that she was treated differently than any other patient with similar symptoms.

McClure claims that CCH failed to perform an appropriate medical screening that would have alerted to her emergency medical condition, a right parietal hemorrhage.  She contends that when she was examined almost four hours after her arrival at CCH Emergency Department, the emergency room physician characterized her condition as a "[n]eurological emergency."  CCH argues that a mere delay in treatment does not amount to disparate treatment.  CCH also argues that McClure's presenting symptoms of vision problems and vomiting did not constitute an emergency medical condition that would warrant immediate attention.

Because a significant delay in screening may be the functional equivalent of a denial of screening, McClure states an EMTALA claim against CCH.  Determining whether there was a delay in screening requires resolving factual disputes after an evidentiary record has been developed.  Thus, we shall deny the motion to dismiss the EMTALA claim.

The Trustees and Unionville move to dismiss the claims of corporate negligence.  They argue they cannot be held liable because corporate liability does not extend to a parent corporation of medical entities or to a family practice clinic.  In response, McClure counters that dismissal at this stage is premature because whether corporate negligence applies to a particular entity is an "individualized inquiry" requiring an examination of the relationship between the entity and the plaintiff.[2]  Whether Unionville

---

[2] Resp. to Trustee & Unionville Mot. to Dismiss (Doc. No. 40) at 14.

or the Trustees owed McClure a duty of care directly cannot be determined in the absence of a factual record. Thus, we shall deny the motion.

## Factual Background

On the morning of September 8, 2015, McClure awoke with a severe headache and vision problems. She scheduled an appointment for later that day with her primary care physician at Unionville. Because she arrived fifteen minutes late, Unionville personnel refused to see her and directed her to go to an urgent care facility.[3] She went directly to a nearby CVS urgent care center. She presented to the nurse practitioner there with a headache, disorientation, and vomiting.[4] An ambulance was called and arrived around 12:13 p.m.[5] The EMTs transported McClure to CCH Emergency Department, arriving at approximately 12:50 p.m.[6]

Upon her arrival at CCH, the EMT noted she "was placed in triage room and was registered."[7] The registration form indicated that McClure presented with "Vomiting, Vision Problems."[8] The forms state she was admitted at 1:00 p.m.[9]

McClure was not seen by any medical personnel until 4:42 p.m., when a registered nurse took her vitals, recording her blood pressure at 171/88 and "that she

---

[3] Compl. (Doc. No. 1) ¶ 16.

[4] *Id.* ¶ 18.

[5] *Id.* ¶ 20.

[6] *Id.* ¶ 24.

[7] *Id.*

[8] *Id.* ¶ 25.

[9] *Id.*

3

had a headache and had vomited that morning."[10] Sometime shortly after 4:55 p.m., she had a CT scan that revealed a "[l]arge right parietal hemorrhage."[11] The attending ER physician, Dr. Eric Parvis, designated her hemorrhage as a "[n]eurological emergency" and ordered her transferred by helicopter to the Hospital of the University of Pennsylvania, where she remained hospitalized until September 14, 2015.[12]

As a result of the hemorrhage, McClure lost vision in her left eye.[13] She now suffers from difficulties with balance and coordination, and participates in both occupational and physical therapy.[14]

### EMTALA

When an individual presents for emergency treatment, EMTALA obligates a hospital to conduct an appropriate medical screening; and, if the hospital determines that the patient has an emergency medical condition, it must stabilize the condition. 42 U.S.C. §§ 1395dd(a)–(c); *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 172–73 (3d Cir. 2009). EMTALA requires hospitals to medically screen and stabilize all patients with emergency medical conditions in a nondiscriminatory manner without regard to financial or insured status. *See* 42 U.S.C. § 1395dd(h); *Toretti*, 580 F.3d at 172–73 (citing *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 252 (1999)); *Correa v. Hosp. of San Francisco*, 69 F.3d 1184, 1194 (1st Cir. 1995).

---

[10] *Id.* ¶ 27.

[11] *Id.* ¶¶ 28–31.

[12] *Id.* ¶ 32 at ECF 10–11.

[13] *Id.* ¶ 34(g).

[14] *Id.* ¶ 34.

4

EMTALA creates a private cause of action for one who suffers personal injury as a result of a violation. It does not create a federal cause of action for medical malpractice. Liability does not rest on negligence or malpractice. Even if the hospital did not deviate from the standard of care, it can be liable if it failed to appropriately screen the patient. Conversely, that a hospital committed malpractice or medical negligence does not mean that it violated EMTALA.

A failure to screen or a delay in screening may be actionable under EMTALA. An inappropriate or faulty screening is not. The latter may be properly brought as a malpractice action, but not as an EMTALA action.

McClure alleges that she had an emergency medical condition and the hospital did not provide an appropriate medical screening examination to determine whether an emergency medical condition existed.[15] With respect to the EMTALA screening requirement, the statute reads:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd.

EMTALA does not define what an "appropriate medical screening examination" is. It does, however, state that the purpose of the screening is to identify whether an

---

[15] Although the complaint refers to stabilization, Compl. ¶ 52, there are no allegations that, directly or indirectly, raise a stabilization claim. Thus, we consider the EMTALA claim as one focused solely on screening.

emergency medical condition exists. An emergency medical condition is defined as a "medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ." 42 U.S.C. 1395dd(e); 42 C.F.R. 489.24(b).

To meet the screening requirements, a hospital must develop a screening procedure to identify emergent conditions, and it must apply that procedure uniformly to all patients with similar symptoms. *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 651 (E.D. Pa. 2010), *aff'd*, 519 F. App'x 739 (3d Cir. 2013); *see also Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo de Puerto Rico*, 417 F.3d 67, 70 (1st Cir. 2005); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994); *Collins v. DePaul Hosp.*, 963 F.2d 303, 306–07 (10th Cir. 1992); *Cleland v. Bronson Health Care Grp.*, 917 F.2d 266, 271 (6th Cir. 1990). Thus, to state an EMTALA failure-to-screen claim, the plaintiff must allege that: (1) the patient had an emergency medical condition; and (2) the hospital did not screen the patient in the same way it screens other patients presenting with similar symptoms.

Determining whether a hospital meets EMTALA's screening requirement is a fact-specific inquiry. On one hand, faulty screening, such as a failure to properly diagnose a medical condition, cannot serve as the basis for a violation of EMTALA's screening requirements. *Byrne*, 684 F. Supp. 2d at 651. If the hospital, in applying its uniform screening procedures, fails to properly diagnose the patient's condition, it may be liable for a malpractice claim, but not for an EMTALA claim. On the other hand, a

6

failure to screen at all is actionable under EMTALA. *Id.* (quoting *Correa*, 69 F.3d at 1192–93). Pertinent to this case, an inordinately delayed or wholly inadequate screening may be deemed a denial of screening. *Id.* at 652.

CCH argues that McClure was screened. It contends that the "hospital personnel submitted multiple 'stat' orders for testing."[16] This may be true. But, according to the complaint, these tests were not ordered or conducted until several hours after she had arrived at the ER.[17] Whether the testing and examination was timely is a factual determination that is inappropriate on a motion to dismiss.

Viewing the allegations in the light most favorable to the plaintiff, there was no screening done from the time of McClure's arrival at the emergency room at 1:00 p.m. until her vitals were taken at 4:42 p.m. She alleges that she had an emergency condition, a right parietal hemorrhage, and the failure to timely treat her condition caused her injury.

CCH argues that a mere delay in treatment, standing alone, fails to state a screening claim.[18] In doing so, CCH mischaracterizes the case law. The cases CCH relies on involved patients who were triaged and examined upon their arrival to the ER.[19] The patients in those cases argued that the hospital failed to conduct an

---

[16] CCH Mot. to Dismiss (Doc. No. 35-2) at 9.

[17] Compl. ¶¶ 28, 30.

[18] CCH Mot. to Dismiss at 11.

[19] *Id.* at 10–13. In citing to the following cases, CCH improperly conflates a hospital's screening obligation with subsequent treatment decisions—the latter of which may only state a claim for medical malpractice, not an EMTALA claim. *See, e.g.*, *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140, 144–45 (3d Cir. 2014) (plaintiff, who was initially screened and admitted, failed to state EMTALA claim because delay in treatment was caused by patient voluntarily leaving examination room without being seen by doctor); *Moore v. Grand View Hosp.*, No. 13-2384, 2014 WL 6676535, at *3 (E.D. Pa. Nov. 24 2014) (Tucker, C.J.) (pregnant woman in labor, who was admitted to ER and underwent numerous tests, failed to state EMTALA screening claim for ER's failure to test for the condition that ultimately resulted in

appropriate medical screening examination because the treatment was faulty, not because the hospital failed to conduct any screening whatsoever or did so too late.[20]

The question is not whether there was a screening. The critical question is whether the delay in screening amounts to an outright denial of screening sufficient to state an EMTALA claim. Answering this question requires making factual determinations that are not resolvable on a motion to dismiss.

A delayed or inadequate screening may, in some circumstances, violate EMTALA. When the screening is so delayed or inadequate that it amounts to no screening, the hospital may be liable for failure to provide an appropriate medical screening examination. *Byrne*, 684 F. Supp. 2d at 652 (citing *Correa*, 69 F.3d at 1192–93, and quoting *Marrero v. Hosp. Hermanos Melendez*, 253 F. Supp. 2d 179, 194 (D.P.R. 2003)). Thus, an EMTALA screening claim survives a motion to dismiss if there is an allegation of a lengthy emergency room delay in screening resulting in the failure to identify, treat, and stabilize an emergent condition. *See, e.g., Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 709, 713–14 (4th Cir. 1993); *Scruggs v. Danville Reg'l Med. Cent. of Va., L.L.C.*, No. 08-00005, 2008 WL 4168645, *3–4 (W.D. Va. Sept. 5, 2008).

In the complaint, McClure alleges specifically that the defendants "fail[ed] to perform an appropriate medical screening:

---

her giving birth to stillborn baby); *Morgan v. N. Miss. Med. Ctr.*, 403 F. Supp. 2d 1115, 1117 (S.D. Ala. 2005) (plaintiff, who received "emergency trauma care and was admitted as a patient" but was discharged without an MRI, failed to state an EMTALA screening claim); *Roa Gil v. Otero Lopez*, 273 F. Supp. 2d 180, 183–84 (D.P.R. 2003) (parents of infant, who was screened and admitted to ER for observation, failed to state EMTALA screening claim for ER's delay in consulting with a pediatrician and ordering x-rays).

[20] *See supra* n.19.

> (a) . . . timely upon arrival;
>
> (b) . . . <u>consistent with the presentations of patients with substantially similar complaints</u> as Dawn L. McClure in a timely manner;
>
> (c) . . . consistent with the presentation of patients who arrive by ambulance to the Chester County Hospital Emergency Department;
>
> (d) . . . treating Dawn L. McClure disparately from other similarly-situated patients."[21]

These allegations are sufficient to state a claim. McClure alleges that CCH's inordinate delay in screening was inconsistent with the way it treated similarly-situated patients.

Whether McClure's presenting symptoms of vomiting and vision problems alerted to an emergency medical condition, which CCH argues they did not, is one of fact and cannot be determined at this early stage. *Cf. Marrero*, 253 F. Supp. 2d at 194 (whether symptoms of nausea and dizziness constitute an emergency medical condition raise questions of fact inappropriate for summary judgment). Symptoms like vomiting and vision problems, in isolation, may not constitute an emergency medical condition. However, they "might well herald the onset of an emergency medical condition" when coupled with additional information like medical history that "would inform a physician's interpretation of that symptom." *Marrero*, 253 F. Supp. 2d at 194 (quoting *Correa*, 69 F.3d at 1192, and *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 (4th Cir. 1992)); *see also Espada-Santiago v. Hosp. Episcopal San Lucas*, No. 07-2221, 2009 WL 605771, at *3 (D.P.R. Mar. 9, 2009) (plaintiff's allegations of EMTALA screening claim survived motion to dismiss because court could infer that patient suffered from an emergency medical condition—abdominal pain and vomiting).

---

[21] Compl. ¶ 49 (emphasis added).

CCH contends McClure has not alleged disparate treatment. With respect to that argument, McClure may show that the hospital followed its screening procedures, but that the procedures were not reasonably calculated to identify critical medical needs. Merely because a hospital uniformly applies its screening procedures does not necessarily make it appropriate or adequate. A screening does not satisfy the EMTALA obligation if it is "so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) (internal quotation marks and citation omitted). Alternatively, she may prove that she was not screened consistent with the standard screening procedures, giving rise to the conclusion that she was not treated as similarly situated patients would have been. In either event, she may recover under EMTALA.

Viewing the allegations of the complaint in the light most favorable to McClure, as we must at this stage, she has alleged enough to give rise to an inference that she received no meaningful screening while her emergency condition deteriorated over the time she went unexamined for almost four hours, resulting in physical harm. Therefore, we shall deny CCH's motion to dismiss.

**Corporate Negligence**

Under Pennsylvania law, a hospital has a non-delegable duty to adhere to the proper standard of care to ensure the patient's safety and well-being. *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991). The hospital's duty is independent of any third party's duty. In other words, corporate negligence does not depend on

establishing a third party's negligence. Thus, a hospital may be liable if it deviates from the standard of care it owes its patient.

The non-delegable duties fall into four categories. They are: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its organization as to patient care; and (4) a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for its patients. *Id.* at 707–08 (citing Restatement (Second) of Torts § 323 (1965)). A hospital may be liable if it breaches any of these duties. *Id.*

To state a claim for corporate negligence, the plaintiff must allege that the medical entity breached one of the four non-delegable duties, the medical entity had actual or constructive knowledge "of the defect or procedures which created the harm," and the breach caused the patient substantial harm. *Id.* at 708 (citations omitted); *see also Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997); *Scampone v. Grane Healthcare Co.* (*Scampone III*), 169 A.3d 600, 606 n.2 (Pa. Super. 2017).

Liability for corporate negligence is not based on *respondeat superior.* It arises from the medical entity's own acts or omissions. The focus is not on what the employee did or did not do, but rather on what the employer did or did not do. *Scampone v. Grane Healthcare Co.* (*Scampone II*), 57 A.3d 582, 597 (Pa. 2012). A claim for corporate negligence "arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." *Welsh*, 698 A.2d at 585. Unlike vicarious liability, corporate liability requires that the defendant had notice of the conduct at issue by virtue of its own misfeasance or nonfeasance—"that the hospital

knew or should have known about the breach of duty that is harming its patients." *Edwards v. Brandywine Hosp.*, 652 A.2d 1382, 1386 (Pa. Super. 1995).

The corporate negligence doctrine has been applied to certain non-hospital entities. A health maintenance organization (HMO) may be held liable under a corporate liability theory. *See Shannon v. McNulty,* 718 A.2d 828, 835–36 (Pa. Super. 1998). So, too, may a professional corporation of doctors with various specialties providing comprehensive care. *Hyrcza v. W. Penn Allegheny Health Sys., Inc.,* 978 A.2d 961, 984 (Pa. Super.), *appeal denied,* 987 A.2d 161 (Pa. 2009). Most recently, the Pennsylvania Supreme Court held that a nursing home and the management company overseeing patient care at the nursing home may be liable under a corporate negligence theory. *Scampone II,* 57 A.3d at 597. Corporate liability has not been extended to a physician's office because the office does not perform the role of a "comprehensive health center with responsibility for arranging and coordinating the total health of its patients." *Sutherland v. Monongahela Valley Hosp.*, 856 A.2d 55, 61–62 (Pa. Super. 2004) (quoting *Thompson*, 591 A.2d at 706).

In determining whether a non-hospital entity owes the plaintiff a duty, courts applying *Thompson* had focused primarily on the role the entity plays in arranging and coordinating the total healthcare of its patients as a comprehensive health center. *Scampone II,* 57 A.3d at 605–06. Instead, the focus is on the relationship between the corporate defendant and the plaintiff. *Id.*; Restatement (Second) of Torts § 323.

This shift in focus does not render an examination of the relationship between the corporate defendant and its employees who care for patients meaningless or unnecessary. On the contrary, to discern whether the corporate defendant owes the

plaintiff-patient a non-delegable duty, one must examine the extent of the corporate defendant's oversight and control of the medical professional directly providing the care.

To determine whether the relationship between the defendant-corporation and the plaintiff-patient gives rise to a duty of care, we apply Section 323 of the Restatement (Second) of Torts. *Scampone III*, 169 A.3d at 617. Under section 323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323. Thus, this section applies where the defendant contractually agreed to oversee and provide proper medical care.

Unionville argues that corporate liability does not extend to physician practice groups.[22] It is true that the Pennsylvania Superior Court declined to find a physician's corporate practice liable for corporate negligence. *Sutherland*, 856 A.2d at 61–62. However, that does not end the inquiry with respect to McClure's claim against Unionville. Subsequent to *Sutherland*, the test for corporate liability was clarified to stress that the key is the relationship between the plaintiff-patient and the corporate defendant. *Scampone III*, 169 A.3d at 617. The focus must be on whether a duty of care arises from the nature of the relationship between the parties. *Id.* With this

---

[22] The count heading for Count II – Corporate Negligence fails to include Unionville. However, elsewhere it avers a corporate liability claim against Unionville. *See, e.g.*, Compl. ¶ 10. The parties agree that McClure intended to allege Unionville's corporate liability.

13

clarification in mind, we analyze whether Unionville owed McClure a direct duty of care under the Restatement.

McClure avers facts that, if proven, would demonstrate that Unionville owed a non-delegable duty directly to her to ensure her quality care, safety, and well-being. She alleges that Unionville was "responsible for caring for" her.[23] She claims that she made an appointment with her primary care physician at Unionville after waking up with a severe headache and vision problems. Because she was fifteen minutes late, the Unionville reception staff sent her away, referring her instead to an urgent care facility.[24]

Drawing all inferences in McClure's favor, as we must, these allegations suffice to support her claim of corporate liability against Unionville at this stage. She claims that, in turning her away, Unionville breached its duty to exercise reasonable care, increasing her risk of suffering physical injury. *See* Restatement (Second) of Torts § 323. She alleges that her injury would not have happened had Unionville not failed in its non-delegable duty.

McClure alleges that as the parent corporation overseeing care at Unionville and the CHH emergency room, the Trustees are liable for corporate negligence.[25] The Trustees counter that it is "not a hospital" and "merely operates as the parent corporation for various health care entities, practices, groups and hospitals."[26] Because

---

[23] *See, e.g.*, Compl. ¶ 10.

[24] *Id.* ¶¶ 13–16.

[25] *E.g.*, *id.* ¶ 40.

[26] Trustees & Unionville Mot. to Dismiss (Doc. No. 33) at 9, ECF 13.

14

it is "not a brick-and-mortar facility," the Trustees argue that they and McClure are " 'legal strangers' under negligence law."[27]

Determining whether the Trustees owed McClure a direct duty of care is an individualized inquiry. At this stage, there is no evidentiary record from which one could determine the extent of the Trustees' involvement in the operation and oversight of Unionville and CCH. Discovery will reveal to what extent the Trustees oversaw the operations of each facility, including whether the Trustees hired medical personnel employed at Unionville and/or CCH; required that it would be notified of incidents and problems with patient care; or established the rules and regulations about how each facility operates. *See Scampone III*, 169 A.3d at 618. Until that information is known, it is not possible to determine whether the Trustees owed McClure a duty of care.

Unionville and the Trustees argue that two corporations cannot both be held liable for corporate negligence because the duties are non-delegable. They contend that allowing the claim to go forward against multiple corporations—finding that they both owed McClure a duty of care directly—will result in multiple entities being exposed to liability for breaching the same duty.[28] They argue that only one defendant may be liable for corporate negligence; and, if any party had a direct duty to McClure, it was CCH, not them. Unionville and the Trustees request we find, even though there is no evidentiary record, that they owed no duty to McClure.[29]

---

[27] *Id.*

[28] *Id.* at 10, ECF 14 (quoting *Scampone II,* 57 A.2d at 606–07).

[29] *Id.*

15

In response, McClure concedes that only one defendant can be liable for corporate negligence because the duties are non-delegable.[30] However, she correctly points out that she alleges several distinct instances of corporate negligence that resulted in harm to her. She claims that Unionville was negligent for turning her away when she was late for her appointment. She alleges that CCH was negligent for delaying her emergency room screening for almost four hours. As for the Trustees, she claims its corporate negligence stems from the events that transpired either at Unionville or CCH.

"This type of individualized inquiry into [the defendants'] duties of care ensures that multiple entities are not exposed to liability for breach of the same non-delegable duties." *Scampone II,* 57 A.3d at 606–07. If it turns out that either Unionville or CCH did not owe McClure any of the non-delegable duties, the Trustees may still face liability for breaching its own non-delegable duties. Each defendant may owe McClure its own non-delegable duties, and may be liable for breaching them. They cannot, however, breach the same duty.

McClure is entitled to develop a factual record to support the applicability of the corporate negligence theory to Unionville and the Trustees. She may be able to show that the Trustees' relationship to McClure sufficed to establish that as the parent corporation of Unionville and CCH, it owed her a duty of care. Thus, we shall deny the motion to dismiss the corporate negligence claims against Unionville and the Trustees.

---

[30] Resp. to Trustee & Unionville Mot. to Dismiss at 13 (citing *Scampone III*, 169 A.3d at 621).